UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SUSAN H. ADAMS,

            Plaintiff,         1:17-cv-01163-MAT

     -v-                     **DECISION AND ORDER**

NANCY A. BERRYHILL,
Acting Commissioner OF Social Security,

            Defendant.

_____

## INTRODUCTION

Susan H. Adams ("Plaintiff"), represented by counsel, brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Acting Commissioner of Social Security ("Defendant" or "the Commissioner") denying her application for supplemental security income ("SSI"). The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 1383(c). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commissioner's decision is reversed, and Plaintiff's motion is granted to the extent that the matter is remanded solely for calculation and payment of benefits. Accordingly, Defendant's motion is denied.

## PROCEDURAL BACKGROUND

On January 14, 2014, Plaintiff protectively filed for SSI, alleging disability beginning April 1, 2012. Administrative Transcript ("T.") 61. The claim was initially denied on April 15,

2014, and Plaintiff timely requested a hearing. T. 73-80. A video hearing was conducted on June 1, 2016, in Kansas City, Missouri by administrative law judge ("ALJ") George Bock. T. 33-60. Plaintiff appeared via video conference with her attorney in Buffalo, New York, and testified. An impartial vocational expert ("VE") and Plaintiff's case manager, Jan Mansfield, also testified.

The ALJ issued an unfavorable decision on July 7, 2016. T. 17-32. Plaintiff timely requested review of the ALJ's decision by the Appeals Council. T. 130-36. On September 13, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. T. 1-6. Plaintiff then timely commenced this action.

## THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. *See* 20 C.F.R. § 416.920(a). At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date. T. 22.

At step two, the ALJ determined that Plaintiff had the "severe" impairment of intellectual deficiency. *Id*. The ALJ also determined that Plaintiff's medically determinable impairments of high blood pressure, mild osteoporosis, and hyperthyroidism did not cause significant work-related functional limitations and thus were nonsevere. T. 23.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered Listing 12.05 (intellectual disorders) in making this determination. T. 23.

Before proceeding to step four, the ALJ assessed Plaintiff as having the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following limitations: can perform repetitive, simple, unskilled work; and her work cannot involve complex instructions, math requirements, or production pace. T. 24.

At step four, the ALJ determined that Plaintiff had no past relevant work. T. 26. At step five, the ALJ relied on the VE's testimony to find that, taking into account Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of order filler, production helper, and laundry worker. T. 27. The ALJ accordingly found that Plaintiff was not disabled as defined in the Act. *Id.*

## SCOPE OF REVIEW

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); *see also*

*Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. *See* 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quotation omitted). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). "The deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

## DISCUSSION

Plaintiff contends that remand for calculation and payment of benefits is warranted because the ALJ: (1) failed to support the RFC finding with substantial evidence; and (2) erred in finding that Plaintiff's impairments do not meet or equal Listing 12.05. For the reasons discussed below, the Court finds the ALJ erred by failing to properly consider Listing 12.05 in making his determination. Moreover, because substantial evidence of record

supports the finding that Plaintiff's impairments meet or equal Listing 12.05(D), remand of this matter solely for calculation and payment of benefits is warranted.

## I.   The Relevant Opinions of Record

### A.   Letter and Testimony of Plaintiff's Case Manager Jan Mansfield, M.A.

On May 25, 2016, Jan Mansfield, M.A., Plaintiff's case manager at Cornerstone Manor through the Buffalo City Mission, wrote a letter to the ALJ detailing her experiences with Plaintiff and her professional opinion regarding Plaintiff's capabilities. T. 220-21. Ms. Mansfield reported that Plaintiff qualified for Cornerstone's supportive housing program due to her learning disability. She noted that Plaintiff's high school records indicated that she was in special education and scored an IQ of 72 in 1973 and 62 in 1975. T. 220. Ms. Mansfield reported Plaintiff was married and had two children, but both children were removed from her care on the grounds that she was an "unfit parent." Plaintiff's husband subsequently had a nervous breakdown and became abusive, and Plaintiff left the marriage.

Ms. Mansfield reported that Plaintiff took pride in her chores at Cornerstone, which included cleaning windows daily, sweeping and mopping. Prior to living at Cornerstone, Plaintiff had a job at Wendy's but was let go due to issues with her personal hygiene. *Id*. In 2014, Plaintiff had a job at Community Services for the

Developmentally Disabled Mobile Work Crew. However, Plaintiff was dismissed from that position due to poor attendance. *Id.*

Ms. Mansfield reported that Cornerstone staff had received complaints that Plaintiff was not showering affected her physical hygiene. Plaintiff admitted to Ms. Mansfield that she showered only once during a two-month period, while living at the Buffalo City Mission's emergency shelter. Ms. Mansfield also reported that the facility had recently received complaints of an odor coming from Plaintiff's room and the staff needed to develop a plan with her to address the issue.

Ms. Mansfield reported that Plaintiff had nearly lost her legal representation for her disability claim because she failed to respond to their correspondence. Plaintiff told Ms. Mansfield that she had forgotten to bring correspondence to Ms. Mansfield's office, despite Ms. Mansfield reminding her to do so. T. 221. Ms. Mansfield further reported that for several years, Plaintiff's long-range housing goal was to move to an apartment complex where a friend of hers lives. However, once she was placed at the top of the wait list, she decided she did not want to move from Cornerstone because she had heard the apartment complex was in a bad neighborhood. *Id.*

Ms. Mansfield opined that Plaintiff's learning disability required her to obtain assistance and support in order to function in life and that qualifying for disability income would be a

tremendous help in supporting her. It was Ms. Mansfield opinion that Plaintiff has been unable to provide for herself. *Id*.

At the hearing, Ms. Mansfield testified she had been Plaintiff's case manager for five years. T. 49. She testified that Plaintiff met with her weekly for coaching and to go over Plaintiff's responsibilities. T. 51. Ms. Mansfield further testified that Plaintiff required a great deal of support because she was forgetful and neglected to complete basic activities of daily living, including keeping up with her personal hygiene, keeping up with her mail, and maintaining contact with various support services. T. 52-53. Ms. Mansfield testified that Plaintiff would require assistance to manage money if she had an income, and would require services of an outside case worker to help her manage the tasks of everyday living if she were to live in her own apartment. T. 54. Finally, Ms. Mansfield testified that she did not believe Plaintiff would be capable of maintaining employment, as demonstrated by her past employment issues. T. 55.

**B.  Letter from Plaintiff's Medical Service Coordinator, Stacey Zinck**

On May 20, 2016, Stacey Zinck, Plaintiff's Medical Service Coordinator through Community Services for the Developmentally Disabled, wrote a letter stating she had worked with Plaintiff for the past five years providing support, advocacy and linkage to supportive services. T. 218. Ms. Zinck reported she met with Plaintiff in-person on a monthly basis and assisted her with her

Supplemental Nutrition Assistance Program (SNAP) and Medicaid Recertifications because she was unable to complete them on her own. Ms. Zinck reported that Plaintiff was unable to complete paperwork and often did not understand what was being asked of her when reading questions. Furthermore, Ms. Zinck reported Plaintiff needed reminders to make her necessary medical appointments and follow through with them. Ms. Zinck reported that Plaintiff had recently lost her job because she did not understand the call-in policy. Plaintiff had called in, but did not leave a message, which she thought satisfied the call-in requirement. Ms. Zinck opined Plaintiff would be unable to maintain her current services on her own. *Id.*

### C. Letter from Arnecia Delk, Plaintiff's Supported Employment Manager at Community Services for the Developmentally Disabled

On May 27, 2016, Plaintiff's former supervisor through Community Services for the Developmentally Disabled, Arnecia Delk, wrote a letter detailing her experiences with Plaintiff. T. 229. Ms. Delk reported Plaintiff was hired as a cleaner for three days per week in May 2013. Plaintiff did not get along well with her co-workers which often caused problems. Ms. Delk reported that Plaintiff only came to work when she wanted to and would not call-in on time, or call-in at all. Ms. Delk reported that she communicated with Ms. Mansfield and Ms. Zinck in attempts to assist Plaintiff in maintaining her employment, but Plaintiff did not

follow through with the policy. Plaintiff was terminated from the Mobile Work Crew after failing to report to work for nearly two weeks in November 2015. Following her termination, Plaintiff was assigned to a job coach to assist her in finding another job, but she was non-compliant with meeting with the job coach and declined to continue working with the supported employment services. *Id*.

In his decision, the ALJ gave the opinions of Ms. Mansfield, Ms. Zinck, and Ms. Delk "little" weight. T. 26. He noted that the record showed Plaintiff could do simple work and that the decision of whether a claimant is "disabled" and unable to work is an issue reserved for the Commissioner.

### D. Opinion of Psychologist Dr. Renee M. Baskin

On July 7, 2011, Dr. Renee M. Baskin administered an intelligence adaptive evaluation of Plaintiff for Community Services for the Developmentally Disabled. T. 239-41. Dr. Baskin reported Plaintiff's hygiene was fair. She was cooperative but somewhat subdued. Her style of responding was deliberate, orderly, and self-correcting. She worked with reflection and deliberation. T. 239. Plaintiff's verbal comprehension score was 66; the perceptual reasoning score was 71; the working memory score was 71; the processing score was 71; and her full scale IQ score was 65. Dr. Baskin noted that Plaintiff's overall functioning was in the mild range of mental retardation and she had a grade 6.9 reading level. T. 240. Dr. Baskin noted Plaintiff's adaptive level was low,

with a mild-moderate deficit. On a daily basis, Plaintiff was able to dress, bathe, and groom herself, and could do some household chores. Dr. Baskin noted that Plaintiff may need assistance with managing money. T. 241.

Dr. Baskin opined that Plaintiff appeared capable of understanding simple directions and instructions and performing simple tasks. She could maintain attention and concentration and maintain a regular schedule. She had limitations in the ability to learn new tasks, perform complex tasks, and make adequate decisions. She generally appeared capable of relating with others and dealing with stress. However, Dr. Baskin further opined that the results of the examination reflected a cognitive and adaptive problem that would interfere with the ability to function on a daily basis. T. 241. Dr. Baskin diagnosed Plaintiff with mild mental retardation and recommended that she continue with Community Services for the Developmentally Disabled. *Id*.

The ALJ did not clearly include or give weight to Dr. Baskin's medical opinion in his decision. Instead, he only mentioned that 2011 adaptive functioning testing indicted Plaintiff needed assistance in the areas of budgeting and in finding and maintaining a job, but that she was noted to be able to do household chores, dress, bathe, and groom herself, prepare food, clean, and independently access the community. T. 25.

**E.    Opinion of Consultative Examiner Dr. Susan Santarpia**

On August 16, 2012, Plaintiff underwent psychiatric and intelligence evaluations by Dr. Susan Santarpia. T. 282-89. Plaintiff denied depression, anxiety, panic attacks, and thought disorders. T. 282. Upon examination, Plaintiff was cooperative and her manner of relating was adequate. Plaintiff appeared well groomed with appropriate eye contact. Her expressive and receptive language capabilities were adequate. She exhibited no evidence of hallucinations, delusions, or paranoia. Plaintiff exhibited a euthymic mood and clear sensorium. Her attention and concentration were intact. Her recent and remote memory skills were also intact. T. 283. Dr. Santarpia noted that Plaintiff's cognitive functioning fell in the low average to borderline range of ability.

Plaintiff reported she was able to dress, bathe, and groom herself. She reported she could cook, clean, do laundry, shop, and manage her own money. Plaintiff reported she enjoyed Bingo and she spent her days watching TV, reading, socializing, and engaging in hobbies and interests. T. 284.

For the intelligence evaluation, Dr. Santarpia reported that Plaintiff had a casual manner of dress and fair hygiene. Plaintiff exhibited normal posture and motor behavior. Dr. Santarpia reported that Plaintiff recalled and understood instructions with deliberate, orderly, and self-correcting responses. Plaintiff worked with reflection and deliberation, with good attention and

concentration. Dr. Santarpia reported that Plaintiff did not evidence significant emotional distress during the evaluation and that the results of the evaluation were considered to be valid and reliable estimates of current functioning. T. 287.

The test results yielded a verbal comprehension IQ of 68; a perceptual reasoning IQ of 84; a working memory IQ of 77; a processing speed IQ of 84; and a full scale IQ score of 74. T. 287-88. The results noted that the score should be considered with caution, given the discrepancy amongst the four constituent indexes making up the full scale score. Plaintiff's verbal comprehension fell within the extremely low range of ability. Her perceptual reasoning and processing speed fell within the low average range, and her working memory fell within the borderline range. T. 288.

Dr. Santarpia opined that Plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others and appropriately deal with stress within normal limits. Dr. Santarpia further opined that Plaintiff had mild impairment with performing complex tasks independently and her difficulties were caused by slight cognitive inefficiencies. Dr. Santarpia diagnosed Plaintiff with a learning disorder and borderline intellectual functioning. T. 284, 288-89.

In his decision, the ALJ gave "great" weight to Dr. Santarpia's opinion, noting it was consistent with the overall record, objective testing of record, Plaintiff's demeanor at the hearing and her reported activities of daily living. T. 26.

## II. Plaintiff's Mental Impairments Meet the Requirements of Listing 12.05(D)

Plaintiff argues that remand is warranted because the ALJ erred by finding Plaintiff's impairments do not meet or equal Listing 12.05(D). The Court agrees.

At the time of Plaintiff's application for benefits, Listing 12.05 defined "intellectual disability" as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 (effective December 3, 2013 to February 25, 2014).

To qualify for disability under Listing 12.05(D), the following criteria must be met, in addition to having an "intellectual disability":

> D.   A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> > 1.   Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

*Id.*

In the decision, the ALJ determined that Plaintiff did not meet the criteria of 12.05(D) because she showed only mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. T. 24. Furthermore, the ALJ noted that Plaintiff's full scale IQ scores have ranged from 62 to 77 and stated that an individual's "highest score is usually more indicative of [their] abilities, as IQ scores usually do not decrease without some intervening trauma." *Id.* However, the ALJ gave no citation or reference for this reasoning. The ALJ also cited Plaintiff's testimony that she was able to use public transportation, do some cooking and cleaning, shop and can manage a checking account, despite reports that she would require help in that area. *Id.* For the reasons set forth below, the Court finds that the ALJ mischaracterized the record and further finds that the record demonstrates Plaintiff meets the criteria of 12.05(D).

As a threshold matter, the Court recognizes that Ms. Mansfield, Ms. Zinck, and Ms. Delk are not "acceptable medical sources" and are instead considered "other sources" in the context of assessing evidence. *See* 20 C.F.R. § 416.913(d)(3). Nonetheless, 20 C.F.R. § 416.927(b) requires an ALJ to consider all relevant evidence in the case record when making a disability determination, including evidence from "other sources" and "non-medical sources." Although information from "other sources" and "non-medical sources" cannot establish the existence of a medically determinable impairment, it may, as in this case, be based on special knowledge of the individual and provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. Social Security Ruling ("SSR") 06-03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006); *see also* 20 C.F.R. § 416.913(d).

SSR 06-03P provides additional guidance on the process of evaluating evidence from "other sources" including "non-medical sources" like Ms. Mansfield, Ms. Zinck, and Ms. Delk. Specifically, SSR 06-03P recognizes that "these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." *Id.* at *3. Accordingly, SSR 06-03P recommends that the adjudicator evaluate evidence from "other sources" using the same factors as those used to evaluate "acceptable medical sources." These factors include:

1.  "How long the source has known and how frequently the source has seen the individual";

2.  "How consistent the opinion is with other evidence";

3.  "The degree to which the source explains the opinion";

4.  "Whether the source has a specialty or area of expertise related to the individual's impairment(s)"; and

5.  "Any other factors that tend to support or refute the opinion."

*Id*. at *4-5. However, not every factor will apply in every case. Instead, "[t]he evaluation of an opinion from a 'non-medical source' who has seen the individual in his or her professional capacity depends on the particular facts of each case." *Id*. at *5. Notably, SSR 06-03P states that "[a]n opinion from a 'non-medical source' who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source." *Id*. at *6. Such treatment of the "other source's" opinion could be appropriate where the source has seen the claimant more often and has greater knowledge of the claimant's functioning over time than the "acceptable medical source." *Id*.

Here, the ALJ gave "great" weight to the opinion of consultative examiner Dr. Santarpia, who saw Plaintiff on one occasion and based her opinion on Plaintiff's self-reports and an intelligence test administered that day. T. 26. Conversely, the ALJ gave "little" weight to the opinions of Ms. Mansfield, Ms. Zinck, and Ms. Delk, each of whom has worked with Plaintiff frequently over a long period of time and has specialized knowledge of Plaintiff's functioning. *Id*. While it was within the ALJ's discretion to weigh these opinions of record as he did, he was not permitted to ignore or mischaracterize relevant evidence provided in the opinions. *Wilson v. Colvin*, 213 F. Supp.3d 478, 485 (W.D.N.Y. 2016) (ALJ significantly erred by ignoring and mischaracterizing evidence that would have precluded plaintiff from competitive gainful employment.). Furthermore, if the ALJ had properly considered the evidence provided by the "other sources" pursuant to SSR 06-03P, rather than ignoring and mischaracterizing it, a finding that Plaintiff meets Listing 12.05(D) would have necessarily followed.

To meet Listing 12.05, a claimant must first demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 (effective December 3, 2013 to February 25,

2014). Plaintiff has met this threshold. As the ALJ acknowledged in the decision, Plaintiff had a full scale IQ score of 62 while in high school. *See* T. 24, 220. In 2011, Dr. Baskin diagnosed Plaintiff with mild mental retardation and noted that her adaptive level was low, with a mild-moderate deficit. T. 241.

To meet the first prong of 12.05(D), Plaintiff needed a valid verbal, performance, or full scale IQ of 60 through 70. Plaintiff has had several IQ tests conducted that have produced scores within the qualifying range of 60 to 70. *See* T. 220 (high school records from 1975 indicate a full scale IQ of 62); T. 240 (July 2011 testing showed verbal comprehension score of 66 and full scale IQ of 65); T. 287 (August 2012 testing showed verbal comprehension score of 68). However, the ALJ dismissed these qualifying scores because Plaintiff had at times scored above the 60 to 70 range and he reasoned, without providing any support, that higher scores were "usually more indicative of [an individual's] abilities." T. 24. While it is permissible for an ALJ to "reject an IQ score as invalid when it is inconsistent with the record," *Juckett ex rel. K.J. v. Astrue*, No. 09-CV-708, 2011 WL 4056053, at *7 (N.D.N.Y. June 29, 2011), there is no indication here that any of the test scores were invalid. Furthermore, although the regulations in place at the time Plaintiff filed her claim do not specify which score an ALJ should rely on when more than one test has been administered, they do state that "[i]n cases where more than one IQ is

customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(D)(6)(c) (effective December 3, 2013 to February 25, 2014). Accordingly, courts have found the lower IQ score should generally be used. *See Coogan v. Astrue*, No. 08-CV-1387, 2009 WL 512442, at *5 n. 1, *6 n. 2 (D.N.J. Feb. 27, 2009) (an ALJ may not decide which of multiple IQ scores he prefers because the regulations only require one valid score in the range of 60 to 70); *Ray v. Chater*, 934 F. Supp. 347, 350 (N.D.Cal. 1996) ("[I]t can be inferred that when multiple I.Q. scores are available the [r]egulations prefer the lowest score."). Moreover, it is well-established that an ALJ, who is not a medical professional, may not evaluate and interpret raw medical data such as diagnostic testing results. *See Dennis v. Colvin*, 195 F. Supp.3d 469, 473-74 (W.D.N.Y. 2016); *Ellis v. Berryhill*, No. 16-CV-6317-FPG, 2017 WL 2531716, at *3 (W.D.N.Y. June 12, 2017) ("[ALJs] must be careful not to succumb to the temptation to play doctor.") (internal quotation marks omitted). Accordingly, the Court finds it was improper for the ALJ to determine Plaintiff's higher IQ scores were more indicative of her capabilities.

The evidence of record also demonstrates that Plaintiff meets the second prong of criteria for Listing 12.05(D). Specifically, there is compelling evidence that Plaintiff has marked restriction

of activities of daily living and marked difficulties in maintaining social functioning. Plaintiff's case manager, Ms. Mansfield stated that Plaintiff has had ongoing issues with showering and maintaining her personal hygiene, which was the cause for termination of her job at Wendy's. She further stated that Plaintiff lost her most recent job working part-time through Community Services because she had poor attendance. T. 220. Plaintiff's Medicaid Service Coordinator, Ms. Zinck stated that Plaintiff was unable to complete paperwork and needs reminders to make necessary appointments and follow through with them. She further noted that Plaintiff had recently lost her job for not understanding the call-in policy that was set in place. T. 218. Plaintiff's former supervisor through Community Services, Ms. Delk stated that Plaintiff did not get along with her co-workers and often caused problems with them. Furthermore, Plaintiff had on-going attendance issues that eventually resulted in the loss of a job. Plaintiff was terminated despite Ms. Delk working with Ms. Mansfield and Ms. Zinck to help her maintain the position with Community Services, demonstrating that she is unable to maintain employment, even in a highly supported and structured environment. T. 229. Finally, Dr. Baskin opined that Plaintiff's cognitive and adaptive problem would interfere with her ability to function on a daily basis and recommended that she continue with Community Services for the Developmentally Disabled. T. 241.

It is evident to the Court that Plaintiff has marked restrictions of activities of daily living and marked difficulties in maintaining social functioning. Plaintiff has well-documented significant limitations maintaining personal hygiene and maintaining a schedule, both of which have caused her to be terminated from jobs. She also has trouble getting along with co-workers and following through with responsibilities of daily life. These well-documented and on-going limitations, coupled with Plaintiff's past full scale IQ scores between the 60 to 70 range, satisfy the criteria of Listing 12.05(D). Accordingly, the Court finds the ALJ erred by failing to find Plaintiff's impairments meet or equal Listing 12.05(D).

## III. Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand solely for calculation and payment of benefits is appropriate where the record persuasively demonstrates the claimant's disability, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980), and there is no reason to conclude that additional evidence exists that might support the Commissioner's claim that the claimant is not disabled, *Butts v. Barnhart*, 388 F.3d 377, 385–86 (2d Cir. 2004).

For the reasons set forth above, the Court finds that the ALJ's decision that Plaintiff's impairments do not meet or equal

Listing 12.05(D) was legally erroneous and unsupported by substantial evidence. The evidence demonstrates that Plaintiff was presumptively disabled under the Listing and had the ALJ properly considered the evidence of record, a disability finding would have necessarily followed.

Finally, the record in this case is complete, and further development cannot reasonably be expected to support a finding that Plaintiff is not disabled. Accordingly, the Court finds that remand solely for the calculation and payment of benefits is warranted.

## CONCLUSION

For the foregoing reasons, the Court finds that the Commissioner's decision was legally erroneous and is not supported by substantial evidence. It therefore is reversed. Accordingly, Defendant's motion for judgment on the pleadings (Docket No. 13) is denied, and Plaintiff's motion for judgment on the pleadings (Docket No. 12) is granted, and the case is remanded solely for the calculation and payment of benefits. The Clerk of Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**

S/Michael A. Telesca
_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     June 10, 2019
           Rochester, New York